**Nico Banks**, OSB No. 241188
Email: nico@bankslawoffice.com
BANKS LAW OFFICE, P.C.
1050 SW 6th Ave # 1100
Portland, OR 97204
Tel.:( 971) 678-0036


**Joseph R. Wojciechowski, Esq**. (pro hac vice pending)
Email: joe@stoltlaw.com
STOLTMANN LAW OFFICES, P.C.
2000 Center Drive, Ste. East C218
Hoffman Estates, Illinois 60192
Tel: (312) 332-4200

*Attorneys for Plaintiffs*


# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION


| | |
|---|---|
| **SCOTT ALLDRIDGE AND ALLDRIDGE FAMILY HOLDINGS, LLC,** | Case No. _____ |
| Plaintiffs, | COMPLAINT<br>Breach of Fiduciary Duty<br>Negligent Misrepresentation<br>Negligence<br>Unjust Enrichment<br>DEMAND FOR JURY TRIAL |
| v. | |
| **JOSHUA GOTTLIEB; THE GOTTLIEB ORGANIZATION; and MANAGEMENT SOLUTIONS LLC,** | |
| Defendants. | |


## COMPLAINT

Plaintiffs Scott Alldridge and Alldridge Family Holdings, LLC through their attorneys,

Stoltmann Law Offices, P.C. and Banks Law Office, P.C., hereby allege against Defendants Joshua Gottlieb ("Gottlieb"), The Gottlieb Organization ("TGO"), and Management Solutions LLC ("MS" or, together with Gottlieb and TGO, "Defendants"), as follows:

## INTRODUCTION

1.      This is a lawsuit for breach of fiduciary duty, negligent misrepresentation, negligence, and unjust enrichment in connection with the marketing, sale, and management by Defendants of a defective premium-financed indexed universal life insurance program that was issued for the benefit of Scott Alldridge.

2.      When Scott Alldridge was introduced to Defendants in 2015, Gottlieb – a self-proclaimed life insurance expert with complex strategies certain to maximize the value of his clients' portfolios – promised Mr. Alldridge that he could easily achieve their objectives of generating substantial retirement income and comfortably providing for his heirs upon his passing. Specifically, Gottlieb not only advised Mr. Alldridge that he had developed a plan that would eventually yield $250,000 in annual retirement income and over ten million dollars in death benefits, but also assured Mr. Alldridge that, among other things, (i) Mr. Alldridge would not be required to invest any monies beyond $50,000 per year, (ii) Defendants would identify the lender and secure the loans necessary to finance the substantial premiums, and (iii) Defendants would manage the plan and ensure that the annual premiums were paid on time and actively manage the policy to ensure that Gottlieb's strategy was working as promised. Gottlieb referred to this investment and retirement strategy as the "Tandem Plan".

3.      Based on these and similar assurances which were ongoing in nature, Mr. Alldridge committed to Gottlieb's plan, paid $821,778.11 over eight years to fund the Tandem Plan, borrowed $1.950 million in premium financing, and pledged valuable collateral to fund Defendants' investment plan and purchase an indexed universal life insurance policy with an initial death benefit

of $12 million.

4.      Unbeknownst to Plaintiffs, Defendants were in dire financial circumstances at the time of these recommendations and in desperate need of the commissions from the policy. Defendants actively led Plaintiffs to believe they were still actively managing the plan for several years and addressing any issues that arose.

5.      Indeed, from 2015 and into 2024, Defendants repeatedly and unequivocally advised Plaintiffs that premium financing was being secured, premiums were being paid, their investment plan was "working," and there was absolutely no reason for concern.  As Plaintiffs learned in late 2023, however, Defendants failed to arrange for or make the annual premium payments on several occasions, depleting the cash value of the policy, and causing a default of collateral requirements with the premium lending bank. As a result, the bank foreclosed on the policy and surrendered it on or about June 30, 2023, unbeknownst to Plaintiffs. The policy was surrendered to the bank and the cash value was used to pay off the loan used to secure the financing for the premium.

6.      The financial consequences of Defendants' unlawful acts and omissions have been nothing short of devastating.  The policy is gone and was foreclosed on by the bank that provided the premium financing loan.  The cash Mr. Alldridge paid into the policy, along with the $456,000 he contributed in June 2023 based on Defendants' recommendation to further secure the plan, is gone.  At the same time, Plaintiff has forfeited the investment returns that he would have enjoyed had Defendants not instructed him to invest in this ill-fated insurance premium financing scheme and instead provided them with competent investment advice, Mr. Alldridge would have enjoyed a record-breaking period for the market instead of investing those monies in Defendants' plan.

7.      Further, since the life insurance scheme unraveled, having attained the age of 56 and being diagnosed with Type II Diabetes, obtaining any similar life insurance to that originally solicited by Gottlieb is impossible, leaving Mr. Alldridge and his family in a less secure financial

Banks Law Office, P.C
1050 SW 6th Ave # 1100
Portland, OR 97204

future.

## PARTIES

8.      Scott Alldridge is, and at all relevant times has been, a domiciliary and citizen of the State of Oregon.

9.      Alldridge Family Holdings, LLC is a limited liability company incorporated under the laws of the State of Delaware and is domiciled in the State of Oregon. Scott Alldridge is the sole member and manager of Alldridge Family Holdings, LLC.

10.     Joshua Gottlieb is an insurance broker who sells life insurance for the Penn Mutual Life Insurance Company.  Upon information and belief, Gottlieb is, and at all relevant times has been, a domiciliary and citizen of the State of Ohio.

11.     The Gottlieb Group (TGO) is a Delaware limited liability company with its principal place of business in Ohio.  Upon information and belief, Gottlieb is the Chairman and Chief Executive Officer of TGO. Upon further information and belief, TGO's members are all citizens of Ohio, and thus TGO is a citizen of Ohio.

12.     Management Solutions, LLC ("MS") is an Ohio limited liability company with its principal place of business in Ohio. MS is the distributor of TGO's active life insurance-based strategy business.  Upon information and belief, Gottlieb is the President of MS.  Upon further information and belief, the members of MS are all citizens of Ohio and, therefore, MS is a citizen of Ohio.

13.     Both TGO and MS, through Gottlieb and other employees, held themselves out as being responsible for the oversight, management and guidance of Plaintiff's life insurance investment strategy at issue in this action.  TGO and MS appear to have common ownership, shared employees and offices, and a shared website and marketing activities.  Both TGO and MS interacted with, and made representations to Mr. Alldridge.

Banks Law Office, P.C
1050 SW 6th Ave # 1100
Portland, OR 97204

## JURISDICTION AND VENUE

14.    This Court has diversity of citizenship jurisdiction under 28 U.S.C. § 1332(a)(1), because the present matter is a civil action where amount in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

15.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because, among other factors, Plaintiff is a resident of the State of Oregon and a substantial part of the events, acts, and omissions giving rise to the claims occurred within the District of Oregon.

16.    This Court has personal jurisdiction over Defendants because, among other reasons, Defendants have conducted business activities in Oregon; and Plaintiffs' claims in this action relate to Defendants' conduct and activities in Oregon.  Additionally, Gottlieb is a licensed Oregon insurance producer; and Gottlieb, through TGO and MS, has sold life insurance products in Oregon, including, but not limited to, the insurance products sold to Plaintiff.

## FACTS COMMON TO ALL COUNTS

**A.    Defendants Induce Plaintiff to Purchase a Life Insurance Policy from Penn Mutual.**

17.    In 2015, Scott Alldridge was looking to change his retirement planning from a 401K model.  He was also considering selling his business and was interested in learning about options to front-load a retirement plan should he choose to sell. Mr. Alldridge was also looking to increase his life insurance to protect his family and cover any business debt in the event he died.

18.    At the time, Mr. Alldridge had a life insurance policy through Ohio National which he purchased in 2010 for which he paid $1,500 annually for $500,000 in life insurance.

19.    Mr. Alldridge spoke with a friend of his, Pat McMahon, who owned a financial services company in Springfield, Oregon, generally about his objectives, and was referred to Bernie Rosen, a life insurance agent and salesman that Mr. McMahon knew, who was affiliated with The Gottlieb Group.

Banks Law Office, P.C
1050 SW 6th Ave # 1100
Portland, OR 97204

20.     Mr. Alldridge contacted Mr. Rosen who introduced Mr. Alldridge to Gottlieb and coordinated the initial contacts and introductions. Mr. Rosen represented that he worked with Gottlieb and assisted him in finding life insurance products for Gottlieb's clients.

21.     Gottlieb introduced Mr. Alldridge to what he referred to as a "white collar" life insurance plan that provided wholesale cost and exposure to the stock market for growth.  Gottlieb further described the "white collar" insurance plan as capable of being used to borrow against at special low rates which allowed for the insurance policy account to accumulate wealth through the spread between the low cost of borrowing to fund the insurance premium and the growth of the investment account linked to the S&P 500.

22.     This "white collar" insurance and investment plan creates a large amount of life insurance and provides a tax shelter for the growth of the assets inside the plan.

23.     Gottlieb told Mr. Alldridge that utilizing dollar-cost averaging with the S&P 500 index assured the success of this strategy. It was simple math according to Gottlieb.  The S&P 500 model, according to Gottlieb, over the past forty years, returned on average 6.5% per year which was roughly triple the interest rate on the loan used to borrow to fund the premium, conservatively. Because of this "gap", the insurance investment account would grow tax free at a realized rate that exceeded the cost of the premium. This growth strategy to assist in funding the premium was represented by Gottlieb to Mr. Alldridge as a sure of a thing as there is.

24.     Mr. Alldridge was sold this "Tandem Plan" based on a $50,000 per year out of pocket premium payment for 10 years with the remaining premium being funded by the low interest premium financing loan. Mr. Alldridge made it clear to Gottlieb that he was only comfortable with committing $50,000 per year out of pocket.  In response, Gottlieb referred to the success of this insurance funding investment program as a virtual guarantee. After ten years, Gottlieb represented, the plan would produce incredible results while providing the security of $12 million in life

Banks Law Office, P.C
1050 SW 6th Ave # 1100
Portland, OR 97204

insurance. By the time Mr. Alldridge reached 62 years of age, he would be able to withdraw cash from the insurance plan, tax free, at a rate of $200,000 to $300,000 per year to fund his retirement years.

25.     Gottlieb also told Mr. Alldridge that the ten-year plan would grow adequately to cover the cost of insurance on a go-forward basis.  Gottlieb called the "Tandem Plan" a "no brainer" and a "100% win." The "Tandem Financial Strategy/Asset Retention" plan and projections were produced by Gottlieb and Management Solutions and were provided to Mr. Alldridge during the initial planning meetings. (See Exhibit 1).

26.     This projection shows the awesome performance expected from this plan and formed the basis in part for Mr. Alldridge to believe what Gottlieb was telling him about this plan.

27.     The illustration provided by Gottlieb showed the yearly premium to be paid as $600,000; the accumulating death benefit; the cash surrender value and death benefit on a net basis; the cash outflow, which was the $50,000 Mr. Alldridge was expected to pay yearly out of pocket, and the collateral requirement to further secure the premium financing.

28.     The illustration shows that after ten years of the plan, by 2024 and by age 58, Mr. Alldridge would have a $12,094,998 life insurance death benefit and a cash value of $94,998.  Then the plan would take off and provide Mr. Alldridge with continued cash benefits, a growing death benefit, and a growing accumulated cash surrender value.

29.     This illustration showed in writing what Gottlieb was representing and also was exactly what Mr. Alldridge was looking for: an investment plan that would provide the security for his family in the event of his death, and also provided income throughout his retirement years, reflected on this illustration as years 11-through the end in green.

30.     Gottlieb represented that his company would:

(a)     expertly manage and advise on the correct life insurance policy to purchase in

Banks Law Office, P.C
1050 SW 6th Ave # 1100
Portland, OR 97204

accordance with the Tandem Plan;

(b)     Gottlieb and TGO would use their institutional knowledge and expertise to secure the appropriate lending from the right financial institution to fund the premium at low interest rates because Gottlieb had long standing relationships he could leverage; and

(c)     Gottlieb and GTO would manage the policy and cash flows on an ongoing basis to ensure the Tandem Plan's success in accordance with Mr. Alldridge's expectations, which included adjusting the plan as necessary.

31.     From the very outset, Plaintiff made clear to Gottlieb both his estate planning objectives and retirement investment objectives. The top priority for this strategy from Mr. Alldridge's perspective was the combination of life insurance and fixed income provided in retirement, which was exactly what Gottlieb represented this strategy provided through this ten year "Tandem Plan."

32.     Noticeably absent from any representations made by Gottlieb about the "Tandem Plan" were risks that the plan could fail under any circumstance. There are no risk disclosures in the written materials provided to Plaintiff about the plan. Surely, Gottlieb himself never informed or counseled Plaintiff of circumstances that would put Mr. Alldridge's Tandem Plan at risk of collapse or failure

33.     Gottlieb portrayed himself as an expert in the insurance and investment field and assured Mr. Alldridge that his knowledge and level of management and service were both unparalleled.

34.     Gottlieb routinely boasted about his expertise and relationships with banks that he used for his clients to provide premium financing as if those relationships led to better financing deals and rates for his clients.

Banks Law Office, P.C
1050 SW 6th Ave # 1100
Portland, OR 97204

35.     Gottlieb constantly told Mr. Alldridge as the years went by "we've got you covered" whenever any issues arose with the policy or the Tandem Plan.

36.     According to TGO and MS's shared website, the Defendants' "Tandem Financial Strategy" is "counterintuitive to conventional wisdom" and juxtaposes life insurance and debt "in a manner that, after a nominal period of cost, develops extraordinary assets and cash inflow opportunities . . ." for their clients.

37.     With the assistance of Gottlieb, Mr. Alldridge completed an application for life insurance with Penn Mutual on September 9, 2015.  Penn Mutual accepted the application after receiving additional correspondence from Gottlieb Group which "clarified" Mr. Alldridge's finances and represented, falsely, that Mr. Alldridge was actually seeking upwards of $19 million in life insurance and that he was selling his business for $5 million.  Mr. Alldridge received this letter from Penn Mutual in August 2024 in response to a request for information and documents in connection with his policy.

38.     On October 14, 2015, Defendants sent Mr. Alldridge an email with several documents attached and a letter. This letter from Gottlieb himself discussed several options for the Tandem Financial Strategy, which included assumptions about Mr. Alldridge's future cash flows that were not accurate.  For example, there is reference made in the letter to a $5 million expected sale of Mr. Alldridge's business which would create a "cash hoard over the next few years."  This was based on pure speculation at that time.

39.     Notwithstanding the speculation about the sale of Mr. Alldridge's business, Gottlieb, Bernie Rosen, and Penn Mutual seized on the opportunity and used the mere idea of the sale of Plaintiff's business as the impetus to sell him the Tandem Plan and massive life insurance policy.

40.     The original plan presented by Gottlieb was for far more life insurance in amounts

upwards of a $20 million death benefit with a million dollar per year premium. This outrageous presentation used the speculative sale of Mr. Alldridge's business, which would apparently yield $5 million in cash after taxes, as the basis to recommend this massive policy.

41.     Despite the delusions of grandeur created by the potential payout the $20 million policy would generate for Gottlieb and Bernie Rosen, Mr. Rosen confirmed his conversations with Mr. Alldridge via email where it was made clear that three options had been discussed with Mr. Alldridge for the Tandem Plan:

   (a)  Pay $50,000 annually for 5 years and then begin taking money out in year 11.

   (b)  Pay $50,000 annually for 10 years and begin taking money out in year 11.

   (c)  Pay $50,000 annually for years 1 and 2, then pay $400,000 in year 3 and begin taking money in year 11.

42.     On October 16, 2015, Gottlieb sent Mr. Alldridge three different Tandem Financial Strategy illustrations, based on the three scenarios outlined by Mr. Rosen. Because the "cash hoard" as Gottlieb put it was not going to happen because Mr. Alldridge did not sell his business, which was a fact Mr. Alldridge made clear in subsequent conversations, the plan was adjusted down to reflect the $50,000 per year for ten years plan that Mr. Alldridge was comfortable with investing. Gottlieb assured Mr. Alldridge that the policy they eventually purchased would be sufficiently paid for through the premium financing and the $50,000 per year investment from Mr. Alldridge, which was supported by the illustrations Gottlieb presented.

43.     The October 15, 2015, letter also references a phone call that Mr. Alldridge would have with the premium financing lender, that Gottlieb would be on that call to assist with answering any questions the lender had, and also instructed Mr. Alldridge how to complete the loan documents.

44.     Based the assurances and representations of Gottlieb, Mr. Alldridge purchased the

Penn Mutual Accumulation Builder Advantage Indexed Universal Life Insurance, policy number 2697199, which had an initial death benefit of $12,000,000, insured the life of Scott Alldridge, and was owned by Scott Alldridge.  The Policy date is October 28, 2015.

45.     Defendants were responsible for handling virtually every aspect of maintaining and servicing the Penn Mutual policy, including, but not limited to, securing and managing premium financing and ensuring that the premiums were paid timely.

46.     To justify the sale of this policy to Penn Mutual, Gottlieb sent a letter to Penn Mutual falsely describing Mr. Alldridge's objectives and his allegedly substantial net worth, which included the cash hoard from the sale of his business, that never happened.  Gottlieb stated in the letter that they had previously sought out a far larger policy, which Plaintiff could afford, but chose to dial it back to the $12,000,000 policy.

47.     The annual premium for the policy was $600,000.  The indexing option selected was the High Participation 1 year S&P 500 Indexed Account. Each year, Mr. Alldridge paid an additional $50,000 to whichever bank was providing the premium financing for collateral to secure the continued financing of the Tandem Plan.

48.     One of the many records signed by Mr. Alldridge and and his wife Janelle Alldridge at the outset was a Projected Loan Performance Schedule from First Insurance Funding.  This Schedule showed premium payments of $600,000 being made for five years.

**B.      Defendants Arrange for Premium Financing and Facilitate Payment of the Annual Premiums from 2015 through 2017.**

49.     For the first three policy years that the Penn Mutual policy was in effect, premium payments were made as expected to Penn Mutual and Mr. Alldridge made his $50,000 cash contribution.

50.     Each of those three years, Defendants arranged for Plaintiffs to borrow the

Banks Law Office, P.C
1050 SW 6th Ave # 1100
Portland, OR 97204

premium amounts and then transmitted payment for the premiums to Penn Mutual.

51.    In October of 2015, Defendants caused Mr. Alldridge to finance the premium payments for the Penn Mutual policy through Barrington Bank & Trust Company ("Barrington Bank"). To that end, Defendants provided Mr. Alldridge with necessary documents such as loan applications, personal guarantee forms, promissory notes, and letters of credit. This financing was finalized on October 14, 2015. The interest rate on the loan was Prime Plus 60 basis points, which at the time was 3.25% plus 0.60%, or 3.85%. Although set by the Prime Rate, the agreement put a minimum floor on the rate of 3.85%.

52.    Barrington Bank, in exchange for providing the premium financing, received a collateral assignment of the cash surrender value and death benefit of the Penn Mutual insurance policy and a personal guarantee from Janelle Alldridge, Scott Alldridge's wife. The funding was formalized through a master promissory note and assignment of Life Insurance Policy as Collateral Personal Guaranty.

53.    On October 21, 2015, Penn Mutual approved of the premium financing arrangement and the Penn Mutual policy was issued on October 28, 2015.  On October 30, 2015, Jeffrey Smith of Management Solutions, LLC, sent Mr. Alldridge a letter with wire transfer instructions, advising him to make two wire transfers with the $50,000 he was "investing".  The first wire transfer was in the amount of $23,485 and was to be paid to First Insurance Funding Corp., care of Lake Forest Bank and Trust, for year one prepaid interest.  The second wire transfer was in the amount $26,515 to Penn Mutual and was for year 1 partial premium funding

54.    The first year premium was funded at that time through two payments: one in the amount of $26,515 from Mr. Alldridge as noted above, and the second in the amount of $573,485 from Barrington/Lake Forest Bank & Trust.

55.    On November 17, 2015, Jeffrey Smith sent an email to Mr. Alldridge which attached

Banks Law Office, P.C
1050 SW 6th Ave # 1100
Portland, OR 97204

a cover letter "explaining the plan for your Program Year One investment strategy for your Tandem Plan." Smith further represented and advised Mr. Alldridge that "we will be able to track the program through the months and have a sense of potential crediting when the segments mature."

56.     The cover letter attached to the November 17, 2015 email sent to Mr. Alldridge makes several representations which include hallmarks of providing investment advice, like:

a) The "Year One investment strategy that The Gottlieb Organization has developed through its MAID Technologies platform wherein we actively Manage Assets, Insurance and Debt with our clients."

b) "It is our philosophy to stage funds into active investment accounts in all years, moving from a fixed rate account to active indexed accounts gradually."

c) "We do not believe in 'timing' the market, trying to pick bottoms and peaks. Instead we are simply spreading risk. Empirical studies support this logic over long investment periods."

57.     The letter continues and explains the process of investing through the Penn Mutual account options and gradually, on a monthly basis, moving the funds to the S&P 500 indexing option.  The letter concludes "Our team will communicate monthly with you regarding your program. We will provide a chart each month which tracks the investment segments, DCA balance, etc." This letter further confirms the multitude of representations and assurances Gottlieb provided to Mr. Alldridge regarding his team's hands-on management of these assets, and that they were committed to providing this advice on an ongoing basis.

58.     In 2016, Gottlieb approached Mr. Alldridge about forming a Delaware LLC to own the insurance policy. Mr. Gottlieb advised Mr. Alldridge to establish this LLC along with a special trust called an ILIT Trust (ILIT stands for "Irrevocable Life Insurance Trust"). Gottlieb, along with an attorney who worked for GTO, advised Mr. Alldridge that creating an LLC, and an

Banks Law Office, P.C
1050 SW 6th Ave # 1100
Portland, OR 97204

insurance trust would offer preferred tax treatment of the death benefit and income down the road.

59.    As such, and based on the advice of Defendants, Mr. Alldridge formed Alldridge Family Holdings, LLC, as a Delaware LLC on or about October 18, 2016.  GTO and Gottlieb assisted Mr. Alldridge in creating the LLC and the requisite operating agreement.

60.    In 2016, Mr. Alldridge made his $50,000 payment to Barrington Bank and Trust on October 24, 2016. Defendants then secured funding for Plaintiffs from Barrington and transmitted the premium payments to Penn Mutual on November 22, 2016, in the amount of $600,000. The policy continued to be invested through the DCA Account, and then apportioned monthly to the High Participation 1 Year S&P 500 Indexed account.

61.    A few months later, on or about January 8, 2017, based on Gottlieb's assurances, representations, and recommendations, Mr. Alldridge signed a Penn Mutual Owner Designation Form, making Alldridge Family Holdings, LLC the owner of the Penn Mutual policy.  Upon information and belief, this form was never sent to Penn Mutual by Gottlieb.

62.    In 2017, Mr. Alldridge continued to abide by his obligations, and paid $50,000 to Barrington on October 20, 2017. Defendants then secured additional funding for Plaintiffs from Barrington and transmitted the premium payments to Penn Mutual on November 9, 2017, in the amount of $600,000. The policy continued to be invested as previously discussed through the DCA account and then to the High Participation 1 Year S&P 500 Indexed account.

63.    In late 2017, Gottlieb approached Mr. Alldridge and discussed refinancing the existing premium financing loan with another bank. Gottlieb told Mr. Alldridge that he and GTO had a special, preferred relationship with BankDirect Finance, LLC, a subsidiary of Texas State Bank.  Gottlieb went so far as to represent that he could secure better lending terms for Mr.

Alldridge due to this relationship and represented to him that one of BankDirect's loan officers used to work for Gottlieb. To that end and based on Gottlieb's advice and introduction Mr. Alldridge to BankDirect Capital Finance, LLC in Lake Forest, Illinois in late 2017 to refinance the existing premium loan for better terms.

64.     Based on the advice of Gottlieb, Mr. Alldridge executed a new assignment of his Penn Mutual Policy to BankDirect on January 8, 2018. This assignment was not accepted by Penn Mutual until August 2018 because, upon information and belief, and unbeknownst to Plaintiffs, Defendants failed to send the correct documentation to Penn Mutual to properly memorialize both the assignment, and the change of ownership of the policy to Alldridge Family Holdings, LLC.

65.     On November 30, 2018, Joshua Gottlieb emailed Mr. Alldridge with "Hi Working on it" in the subject line. Gottlieb wrote to address problems with the plan and that "information we've been receiving during this study has been flawed." A few days later, on December 3, 2018, Jamie Gottlieb from GTO clarified that there was an issue with the DCA investment and reconciling it with Penn Mutual. Jamie Gottlieb confirmed that according to Penn Mutual, there were others who had the same issue, and that GTO was continuing to work on the issues. Gottlieb blamed Penn Mutual's faulty illustrations and assured Plaintiffs that their team had spent countless hours analyzing the plan and "stress testing" it.

66.     On December 5, 2018, Jamie Gottlieb emailed Mr. Alldridge "All figured out" and that he should expect a letter and package the following day. The package was the Tandem Financial Strategy Asset Retention Plan dated December 2018.

67.     On October 8, 2018 a notice of default was sent by BankDirect, which indicated there was a collateral shortfall of $327,958. In response, Gottlieb formulated a plan whereby Mr.

Alldridge would pay $115,000 to BankDirect and then provide additional collateral to further secure the lending arrangement for the Penn Mutual Policy.

68.     In January 2019, based on the recommendations and assurances of Gottlieb that this long-term investment plan would continue to work, Plaintiff paid $327,778.11 to BankDirect to buy a CD from Texas State Bank to increase the collateral at BankDirect securing his premium financing loan. This additional collateral was in the name of A&A Properties Northwest, LLC, another LLC formed by Plaintiff based on the advice of Gottlieb, to shelter the interest paid by the CD from taxation as much as possible, and was used to invest in a six month rolling CD earning 1% per year.  Mr. Alldridge was told by Gottlieb and GTO that providing this additional collateral assured the continued success of the Tandem Plan investment strategy.  Mr. Alldridge trusted Gottlieb and believed that Gottlieb understood how this plan worked better than he did, so he trusted his advice to increase the collateral to the bank.

69.     For the 2018, 2019, and 2020 policy years, no premiums were paid to Penn Mutual to sustain the Tandem Plan. But Mr. Alldridge continued to make his payments to the lending bank dutifully each year including paying $29,000 on October 25, 2018, $50,000 on September 13, 2019, and $50,000 on August 18, 2020. Mr. Alldridge did not know that the premium financing he signed off on was not being used by Gottlieb to continue to fund the Penn Mutual Policy pursuant to the Tandem Plan. Because the premium was not being paid, the value of the Policy stagnated and eventually began to decrease as more of the cash value was used to fund the gap between the costs and expense of the policy, and the index performance.  To put it simply, the Policy was cannibalizing itself slowly, eroding the core asset used by BankDirect to collateralize the premium financing loan.

70.     Despite the "Plan" being chronically underfunded, on December 2, 2020, Jamie

Banks Law Office, P.C
1050 SW 6th Ave # 1100
Portland, OR 97204

Gottlieb, on behalf of The Gottlieb Organization, sent Mr. Alldridge an email recapping a recent discussion that they had.  The email states "Bottom line – the Plan is performing as we expected (or better) since we last spoke." Jamie Gottlieb credited "Ashkay" as doing a "really nice job on the investments."  Jamie Gottlieb also stated that he renegotiated the premium loan down to 3.13%.

71.     On August 4, 2021, Jamie Gottlieb emailed Mr. Alldridge, seeking to touch base about his Tandem Plan renewel, which included discussing "our recommendations for the year ahead." The email continued "As you know, we have worked diligently to operate this plan as efficiently as possible for you and your family. We will continue to do so."

72.     On August 23, 2021, $150,000 was paid to Penn Mutual as a partial premium payment, facilitated by the lending arrangement with BankDirect. Mr. Alldridge also made his $50,000 per year payment on September 27, 2021.

73.     On November 1, 2021, Mr. Alldridge received an email from Joseph Amodeo, who introduced himself as the newest member of the Gottlieb Group. He stressed that he worked closely with Jamie and Joshua Gottlieb and the TGO team in New York. He wrote "I'm excited to work with the TGO team to continue to support the Plan, expand our breadth and quality of service, and be a resource for you and your family."

**C.     Gottlieb's Ten-Year Investment Plan Runs Aground Amid Rising Interest Rates and Lost Control.**

74.     Gottlieb lost control of Mr. Alldridge's Tandem Plan by 2022, although he never told Mr. Alldridge this.  Instead, on August 2, 2022, Gottlieb sent Mr. Alldridge a letter advising him of his coming "7th Annual renewal process for the Alldridge Family Holdings' Tandem Financial Strategy." This plan including Gottlieb's team working "internally to undertake an initial analysis of where your Plan began, and where it is to date" along with "recommendations for the

Banks Law Office, P.C
1050 SW 6th Ave # 1100
Portland, OR 97204

coming year."

75.     The Loan Agreement with Bank Direct was amended in October 2022 and changed in a material way.  First, it contained a maturity date of October 27, 2023 at the latest.  It also changed how the interest rate on the loan was calculated because LIBOR was no long being published and it changed the interest calculation to be based on the BSBY Rate (BSBY is an acronym for Bloomberg Short-Term Bank Yield Index).

76.     The applicable interest rate for the new loan agreement was the greater of the BSBY rate (defined as the BSBY 12-Month rate), plus the interest rate spread (defined as 188 basis points or 1.88%), and the "minimum Interest rate" defined as 3.13%. Boiled down, if the BSBY increased in any material amount, the interest rate on the loan that paid for Mr. Alldridge's life insurance premiums would increase accordingly.

77.     Interest rates spiked dramatically throughout 2022 and into 2023.  The BSBY 12-month rate increased from 0.49871% on January 5, 2022, to 5.39% on November 1, 2022. This caused the realized interest rate of the loan that was secured by Mr. Alldridge's Penn Mutual policy to also increase dramatically.  The interest rate increase caused the spread between the S&P indexing of the Penn Mutual plan and the interest owed on the premium financing loan to disappear and actually invert. Simply put, the entire concept of the Tandem Plan – that the return on the Index would more than cover the cost of lending – vanished.

78.     On October 6, 2022, Jaime Gottlieb sent Mr. Alldridge an email confirming the loan extension they negotiated on Plaintiffs' behalf, and sent him the documents he needed to sign via DocuSign. Mr. Alldridge thanked Jamie Gottlieb for securing the extension, but expressed his concerns about the impact rising interest rates would have on his Plan, noting his concern that

Banks Law Office, P.C
1050 SW 6th Ave # 1100
Portland, OR 97204

"high rates will eat up what little equity I have in my plan. And this would be pretty devastating to me."

79.     In response, Jaime Gottlieb said "We are on it – and are looking to schedule a meeting with a plan in the next two weeks."

80.     On January 4, 2023, Joshua Gottlieb texted Mr. Alldridge "Can you and I get on a call today re Tandem. I want to make some moves to preserve your values." Mr. Alldridge didn't know who this message came from, so after the individual identified himself as "Josh Gottlieb", Mr. Alldridge arranged for a phone call the following week because he was out of the country at that time.

81.     Over the course of this specific time frame in early 2023, Mr. Alldridge had several phone calls with Mr. Gottlieb about the Tandem Plan.  Gottlieb repeatedly represented to Mr. Alldridge that "I've got you covered", "I am working on a plan", "you have been a great client who follows my recommendations", and "I will personally invest my funds to keep your plan alive and working."

82.     On February 17, 2023, Gottlieb texted Mr. Alldridge: "I'll get you thoughts and plan over next few days."  He then proceeded to make excuses for his poor communications and failure to provide any real plan, including that his computer had been stolen.

83.     On May 19, 2023, Mr. Alldridge sent Gottlieb a text saying, "Have a couple messages into you-can we chat soon?" Gottlieb responded, "I can't talk now. I have put funds to BDCF so you are 'safe'. I'll reach out to you this weekend or we can talk Monday.  Quiet but not forgetting you. (prayer hands emoji)." Mr. Alldridge does not know what "BDCF" is, but was also

Banks Law Office, P.C
1050 SW 6th Ave # 1100
Portland, OR 97204

told by Gottlieb that he "took his cash to the sidelines" to protect it.

84.     On May 30, 2023, based on the advice of Joshua Gottlieb, Mr. Alldridge confirmed with BankDirect the liquidation of the CD he owned with Texas Capital Bank, which was purchased to add collateral for the loan in the first place, and that the proceeds from the liquidation were to be applied to pay-down the balance owed.

85.     On June 13, 2023, David Fleissner at BankDirect confirmed that the CD was liquidated and the proceeds of $456,412.34 was applied to the loan balance.

86.     On June 30, 2023, BankDirect executed a request to terminate Mr. Alldridge's Penn Mutual insurance policy, which was accepted by Penn Mutual.  BankDirect signed the surrender form as the Assignee. No notice went to Mr. Alldridge from anyone that only two weeks after he surrendered his Certificate of Deposit, that BankDirect foreclosed on his life insurance and took whatever cash value it had to satisfy the remainder of the premium financing loan.

87.     Despite Gottlieb's written and oral representations just months before that Mr. Alldrige's plan was protected, two weeks after agreeing to surrender the CD to BankDirect to pay down the loan, which Gottlieb said would protect and extend the Tandem Plan, the bank foreclosed and terminated the policy.

88.     Gottlieb never discussed with Plaintiff the risk that rising interest rates would have on the success of the Tandem Plan.  Gottlieb never disclosed in any of the illustrations provided to Mr. Alldridge that rising interest rates would stress the Tandem Plan to the breaking point and would result in the premium financier to foreclose on the Policy.

89.     Gottlieb never disclosed in any way to Plaintiff that the Tandem Plan was

Banks Law Office, P.C
1050 SW 6th Ave # 1100
Portland, OR 97204

perpetually underfunded and would never succeed based on the express limitations imposed by Mr. Alldridge. Instead of being forthright and honest with Mr. Alldridge and informing him directly that there was no way the Tandem Plan would work with him contributing $50,000 per year plus, possibly some additional collateral, he provided Mr. Alldridge with written representations to the contrary reflecting the plan paying out in year 11 and into perpetuity.

90.     Gottlieb, Rosen, and the rest of the GTO team had a reason for telling Mr. Alldridge whatever he needed to hear to invest in the insurance policy: the Penn Mutual life insurance policy sold to Mr. Alldridge paid them about $267,600 in commissions, including thousands of additional dollars on a go forward basis. Gottlieb, Rosen, and the GTO team had a substantial financial incentive to lure Mr. Alldridge into paying for their elaborate Tandem Plan without providing him with any realistic projections or risk disclosures.

91.     Mr. Alldridge paid $821,778.11 out of pocket for Gottlieb's Tandem Plan investment, for nothing. He had $12 million in life insurance that vanished and is now functionally uninsurable due to his age and Type II Diabetes diagnosis. The success of the Tandem Plan was represented to Mr. Alldridge as *fait accompli* so long as he kept up with his end of the bargain, which Mr. Alldridge more than did.

**D.     Defendants Checkered Past Was Never Disclosed to Mr. Alldridge and Neither Was Gottlieb's Perilous Financial Condition.**

92.     As Plaintiffs recently discovered, Gottlieb was in dire financial circumstances and desperate need of the substantial commissions he earned at the time he persuaded Plaintiffs to purchase the Penn Mutual Policy. Among other issues he was confronting, Gottlieb owed millions of dollars in unpaid federal, state, and local taxes.

Banks Law Office, P.C
1050 SW 6th Ave # 1100
Portland, OR 97204

93.      When the Tandem Plan was solicited and sold to Mr. Alldridge, Mr. Gottlieb was licensed as a financial advisor through the Financial Industry Regulatory Authority (FINRA) and a registered representative of Benefit Funding Services, LLC. According to available records, Mr. Gottlieb was "permitted to resign" in March 2017 after being unresponsive to a FINRA investigation into his conduct.

94.      On May 3, 2017, Gottlieb voluntarily accepted a lifetime ban from FINRA membership by signing an Acceptance, Waiver, and Consent, No. 2015044606802 ("AWC"). The AWC states that the FINRA investigation began in March 2015 and involved private securities transactions away from his broker-dealer firm, Benefit Funding. Gottlieb actively participated in the investigation and even sat for a deposition. Gottlieb then stopped cooperating with the investigation and accepted a lifetime ban.

95.      Gottlieb knew that, because commissions are typically calculated based on the amount of the annual premiums in the first few years immediately following the sale of new policies, he could maximize his return by convincing Plaintiff to purchase the Penn Mutual policy with annual premiums totaling $600,000 per year.

96.      Upon information and belief, Defendants were paid approximately $267,000 in commissions from Penn Mutual within the first three years that the Penn Mutual Policies were in effect, with additional commissions paid on a go forward basis.

97.      As his professional life was under siege by regulators and as the tax liens mounted, Gottlieb resorted to selling expensive, massive, and unsupportable life insurance policies through his "Tandem Plan" so that he could maximize his payout to sustain his lifestyle and pay litigation claims, which were also mounting.

98.      Defendants have been sued multiple times nationwide for virtually identical

Banks Law Office, P.C
1050 SW 6th Ave # 1100
Portland, OR 97204

insurance schemes.

**E.      Defendants Owed Specific Duties to Mr. Alldridge.**

99.      Under Oregon law, a special relationship exists between an insurance broker and the broker's client. This special relationship is a fiduciary relationship, and it extends as well to the intended beneficiaries of the polices to be procured.

100.      Under Oregon law, an insurance broker who agrees to procure insurance for another for a fee owes a fiduciary duty to exercise reasonable skill and care in obtaining that insurance.

101.      Under Oregon law, an insurance broker also owes a fiduciary duty of care to advise as to the polices that were requested.

**CLAIMS FOR RELIEF**

**Count One**
**(Breach of Fiduciary Duty)**

102.      Plaintiffs repeat and reallege the allegations in paragraphs 1 through 101 as if fully set forth herein.

103.      By entering into a non-adversarial relationship with Mr. Alldridge under which Defendants were purportedly acting to further the economic interests of Mr. Alldridge and his heirs, Defendants further created a special relationship that imposed duties of care with respect to Mr. Alldridge.

104.      Defendants represented themselves as experts in the field of insurance and retirement planning and further represented that their expertise was specialized and beyond the knowledge and understanding of other financial and insurance advisors.

105.      As a licensed insurance producer, Defendants acted in a fiduciary capacity and, thus, also owed Plaintiffs a heightened duty of care.

Banks Law Office, P.C
1050 SW 6th Ave # 1100
Portland, OR 97204

106.    As fiduciaries, Defendants owed Plaintiffs a duty of loyalty and were required to act in their best interests.

107.    As fiduciaries, Defendants owed Mr. Alldridge the duty to exercise reasonable skill and care in marketing and selling the Tandem Plan.

108.    As fiduciaries, Defendants owed Mr. Alldridge the duty to exercise reasonable skill and care in designing the Tandem Plan that was consistent with Mr. Alldridge's instructions, limitations, and goals.

109.    As fiduciaries, Defendants owed Mr. Alldridge a duty to exercise reasonable skill and care in providing advice regarding the performance of the Tandem Plan.

110.    Defendants breached the duties they owed to Plaintiffs by, among other acts and omissions, (i) advising and inducing Plaintiffs to abandon his existing policies and investments in favor of Defendants' investment plan, (ii) advising and inducing Plaintiffs to incur substantial debt and pledge valuable assets as collateral to implement and finance Defendants' investment plan, (iii) failing to properly manage and service the Penn Mutual Policy by, among other things, failing to secure premium financing and pay the annual premiums, (iv) repeatedly misrepresenting to Plaintiffs that the investment plan was "working," and there was no reason for concern, (v) marketing, selling, and designing a defective Tandem Plan that was not consistent with Mr. Alldridge's instructions, limitations, and goals, and (vi) consistently placing the interests of themselves over Plaintiffs.

111.    Defendants knew or should have known that the Tandem Plan was defective and that it would fail, even if returns were greater than projected and expenses were consistent. Defendants breached their fiduciary duties by failing to advise Mr. Alldridge of the defects of the Tandem Plan.

112.    Defendants further breached their fiduciary duties to advise Mr. Alldridge

Banks Law Office, P.C
1050 SW 6th Ave # 1100
Portland, OR 97204

concerning the performance of the Tandem Plan when they falsely stated that the program was performing as expected and even performing better than anticipated, lulling Mr. Alldridge into continuing to make contributions to the Tandem Plan.

113. Defendants' breaches were either knowing and intentional, or reckless.

114. As a direct result of Defendants' breaches, Plaintiffs have suffered, and continue to suffer, substantial financial harm.

**COUNT TWO**
**(Negligent Misrepresentation)**

115. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 101 as if fully set forth herein.

116. Under Oregon law, a special relationship exists between an insurance broker and its clients, as well as the intended beneficiaries of the policy.

117. Under Oregon law, nongratuitous suppliers of information owe a duty to their clients and intended third-party beneficiaries to exercise reasonable care to avoid misrepresenting facts.

118. Defendants owed Mr. Alldridge a duty to exercise reasonable care regarding the representations they made in connection with the Tandem Plan.

119. Defendants made false representations regarding the Tandem Plan, including that was designed to be consistent with Mr. Alldridge's instructions, limitations, and goals, as well as how the program functioned.

120. Defendants made false representations that the Tandem Plan was outperforming expectations or performing as expected for years. When issues arose with the Tandem Plan, Defendants misrepresented their intent and ability to address the issues and fix them, as opposed to explaining the reality to Mr. Alldridge that the Tandem Plan had failed and was never designed

Banks Law Office, P.C
1050 SW 6th Ave # 1100
Portland, OR 97204

to succeed.

121.    Mr. Alldridge relied on Defendants' misrepresentations when he, among other things, agreed to purchase the Penn Mutual Policy, pay $50,000 per year to fund the Tandem Plan, agreed to borrow $600,000 per year to pay the Penn Mutual premiums, agreed to invest in a Certificate of Deposit to further secure his funding, and then agreed to release that collateral to pay down the premium financing loan.

122.    As a direct and proximate result of Defendants' ongoing misrepresentations and wrongful omissions, Mr. Alldridge suffered damages, and continues to suffer financial harm.

## COUNT THREE
### (Negligence)

123.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 101 as if fully set forth herein.

124.    Under Oregon law, a special relationship exists between an insurance broker and its clients. This special relationship is fiduciary in nature, and it extends to  the intended beneficiaries of the policies to be procured.

125.    Under Oregon law, an insurance broker who agrees to procure insurance for another for a fee owes a reasonable duty to exercise reasonable skill and care in obtaining that insurance.

126.    Under Oregon law, an insurance broker also owes a reasonable duty of care when providing advice about the insurance policies that were requested.

127.    By entering into a non-adversarial relationship with Mr. Alldridge under which Defendants were purportedly acting to further the economic interests of Mr. Alldridge and his heirs, Defendants further created a special relationship that imposed duties of care with respect to Mr. Alldridge.

Banks Law Office, P.C
1050 SW 6th Ave # 1100
Portland, OR 97204

128.    Defendants represented themselves as experts in the field of insurance and retirement planning and further represented that their expertise was specialized and beyond the knowledge and understanding of other financial and insurance advisors.

129.    Defendants owed Mr. Alldridge a duty to exercise reasonable skill and care in marketing and selling the Tandem Plan.

130.    Defendants owed Mr. Alldridge a duty to exercise reasonable skill and care in designing the Tandem Plan consistent with Mr. Alldridge's instructions, limitations, and goals.

131.    Defendants owed Mr. Alldridge a duty to exercise reasonable skill and care in providing advice regarding the performance of the Tandem Plan.

132.    The Defendants breached the duties of care that they owed Mr. Alldridge, including by marketing, selling, designing and giving ongoing advice about the defective Tandem Plan, that was not consistent with Mr. Alldridge's instructions, limitations, and goals.

133.    Defendants knew or should have known that the Tandem Plan was defective and that it would fail, even if returns were greater than projected and expenses were consistent with projections. Defendants breached their duties by failing to advise Mr. Alldridge of the defects in the Tandem Plan.

134.    Defendants further breached their duties to advise Mr. Alldridge concerning performance of the Tandem Plan when they falsely stated that the Tandem Plan was either performing as planned or overperforming, which lulled Mr. Alldridge into continuing to make contributions to the Tandem Plan.

135.    As a direct and proximate result of Defendants' breaches of duty, acts and omissions, Alldridge suffered damages, and continues to suffer financial harm.

Banks Law Office, P.C
1050 SW 6th Ave # 1100
Portland, OR 97204

**COUNT FOUR**
**(Unjust Enrichment)**

136.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 101 as if fully set forth herein.

137.    Defendants made representations concerning the Tandem Plan. To Mr. Alldridge for the purpose of obtaining financial consideration.

138.    Defendants representations were false and Mr. Alldridge agreed to purchase the Penn Mutual Policy as part of the Tandem Plan because of those false representations.

139.    It would be unjust and inequitable for Defendants to retain the benefits that they gained through their misrepresentations and inequitable conduct.

**WHEREFORE,** Plaintiffs demand judgment against Defendants, jointly and severally, for: (i) compensatory, special, consequential, and incidental damages, plus interest; (ii) pre-judgment interest as allowed by law; (iii) reasonable counsel fees and costs; and (iv) such further relief as the Court finds to be just and fair.

**DEMAND FOR A JURY TRIAL**

Plaintiffs hereby demand a trial by jury for all claims on which a jury trial is available as a matter of law

Dated: October 15, 2024

**Banks Law Office, P.C.**

By: /s/ Nico Banks
    Nico Banks OSB No. 241188

Banks Law Office, P.C
1050 SW 6th Ave # 1100
Portland, OR 97204

Tel: 971-678-0036
E-mail: Nico@banksawoffice.com
Banks Law Office, P.C.
1050 SW 6th Ave # 1100
Portland, OR 97204

-And-


Josepth R. Wojciechowski, Esq
 (pro hac vice pending)
Stoltmann Law Office, P.C.
2000 Center Drive, Ste. East C218
Hoffman Estates, Illinois 60192
T: 93120 332-4200
E: joe@stoltlaw.com

*Attorneys for Plaintiffs*